YATES, Judge.
O.L.D. appeals, as the father of a now eight-and-one-half-year-old son. On April 6, 1995, the child’s mother executed a “Consent or Relinquishment of Minor for Adoption,” consenting to the adoption of the child by his maternal grandparents, J.L.C. and J.C.[1] The child’s grandparents petitioned the probate court on June 7, 1995, seeking to adopt the child, alleging: that the father had abandoned the mother and child in January 1991; that the child had lived with the grandparents since that time; that the father’s whereabouts were unknown; and that the father had neither supported the child nor contributed to the child’s welfare; that the mother, since consenting to the adoption, had been murdered; and that the grandparents wished to go forward with the adoption. The court entered an order on August 14, 1995, granting the petition.
On December 13,1996, the father moved to have the adoption set aside. On April 29,1997, the father moved to have the case transferred to the juvenile court. Following a hearing, the juvenile court, on October 8, 1997, entered an order setting the adoption aside, finding that the father had been improperly served with notification of the pending adoption. The court further ordered that the child remain in the physical custody of the grandparents pending further proceedings.
The grandparents, on October 21, 1997, petitioned the court for custody of the child, alleging that the child was dependent, pursuant to § 12 — 15—l(10)(c), Ala. Code 1975. The grandparents amended their petition, to seek child support pursuant to Rule 32, Ala. R. Jud. Admin. The grandparents also sought to terminate the father’s parental rights. Following an ore tenus proceeding, the court, on May 19, 1998, awarded temporary custody of the child to the grandmother, ordered the father to pay $475 per month in child support, and denied the motion requesting a termination of the father’s parental rights.[2] The father appeals.
The record indicates that at the time of the child’s birth the mother and father were not married, but were living together in Georgia. After the child was born, the mother moved to Montgomery to live with her parents so that her mother could assist with the child’s care. After five weeks, the mother and child moved back to Georgia to live with the father. In July 1990, the mother and child again moved to Montgomery to live with the child’s grandparents. Shortly thereafter, the father also moved to Montgomery to live with them. The mother and father were married in September 1990. Shortly after the mar *301 riage, the mother and father had planned to move to Ohio with the child. The night before they were to move, they got into an argument. The grandfather called for police assistance, and the father was asked to leave the residence. The father moved to Ohio alone; however, the mother and child moved to Ohio in November 1990 to be with the father.
In January 1991, the mother left Ohio with the child and returned to the grandparents’ home in Montgomery. The mother moved to Atlanta, Georgia, in January 1992 and left the child in the physical custody of the grandparents. The father and mother maintained contact by telephone until the mother’s death in May 1995. The mother never informed the father that the child was living with the grandparents, and the father assumed that the child was with the mother in Atlanta. The father testified that he had spoken with the child by telephone, using a three-way calling system on several occasions. The father stated that he had sent the mother money on a monthly basis. However, the grandmother testified that the father had sent money only on three occasions. She stated that he had sent three money orders, totaling $140, and that the grandfather had made a copy of each money order. The father testified that the mother moved often and that on several occasions he did not know her whereabouts. He stated that he would have to wait for the mother to contact him. Although the father attempted on several occasions to arrange for visitation, his attempts were unsuccessful. The father did not see the child from January 1991 until October 1997.
The father last spoke with the mother in April 1995. The mother had told the father that she was moving into a new residence and that she would notify him when she got settled in. When the father did not hear from the mother he became worried and contacted the grandmother. The grandmother told the father that she did not know where the mother was, .even though she knew at the time that the mother had been murdered. The grandmother also did not inform the father that the child was living with her. The father eventually learned, in October 1995, that the mother had been murdered and that the child was living with the grandmother. The father testified that when he found out that the child was living with the grandparents he offered to provide clothes and other support, but was told by the grandparents that they did not need anything from him. He was also told not to telephone the grandparents’ residence again. Thereafter, the father employed an attorney, discovered the adoption, and then proceeded to have the adoption set aside.
At the outset, we note the well-settled rule that matters regarding child custody rest soundly within the discretion of the trial court and that judgments regarding those matters will not be disturbed on appeal absent an abuse of discretion. Watson v. Watson, 634 So.2d 589 (Ala.Civ.App. 1994). The court determined that O.L.D. was presumed to be the child’s father, pursuant to § 26-17-5(a)(3)b., Ala.Code 1975, and, therefore, that he was entitled to the presumption afforded parents over nonparents in custody disputes enunciated in Ex parte Terry, 494 So.2d 628 (Ala. 1986). In Terry, our supreme court held that in a custody dispute between a parent and a nonparent, the court may not award custody of the child to the nonparent without first finding, by clear and convincing evidence, that the parent is unfit. Id.; see also Ex parte D.J., 645 So.2d 303 (Ala. 1994)(same presumption made applicable in a custody dispute between father of child born out of wedlock and a nonparent). This presumption may be defeated if the parent voluntarily forfeits custody of the child to the nonparent. Roden v. Colburn, 522 So.2d 290 (Ala.Civ.App. 1988). Here, the court found that the father had had virtually no contact with the child and had provided little support for the child since January 1991. The court further found that the *302 father had abandoned the child to the mother’s care and had led a completely autonomous life in Ohio. The court concluded that the father was guilty of substantial misconduct in his failure to have any relationship with, or to support, the child and that those facts defeated the parental presumption in his favor and supported an order denying him custody of the child.
The father appeals from the order denying him custody. He argues that the evidence did not establish that he was unfit and, or guilty of such misconduct or neglect as would overcome the presumption afforded to him by Terry. This case is not simply a custody dispute between a parent and nonparent, but, rather, is a dependency case; therefore, Terry is not applicable. See Anonymous v. Anonymous, 504 So.2d 289 (Ala.Civ.App. 1986). The grandparents’ petition alleged that the child was a “dependent child,” within the meaning of that term as defined in § 12-15-1(10)(c), Ala.Code 1975. “‘When the petitioners alleged that the child was dependent, that terminology triggered the trial court to utilize the dependency statutes of the juvenile code.’ ” W.T. v. State Dep’t of Human Resources, 707 So.2d 647, 650 (Ala.Civ.App. 1997), quoting C.P. v. M.K., 667 So.2d 1857, 1360 (Ala.Civ.App. 1994) (Thigpen, J., specially concurring in part and dissenting in part). Upon finding a child to be “dependent,” the court may make any order of disposition necessary to protect the welfare of the child, including transferring legal custody of the child to a relative. § 12-15-71(a)(3)e., Ala.Code 1975; Jones v. Webb, 524 So.2d 374 (Ala.Civ.App. 1988). This court held in W.T. that the parental presumption set forth in Ex parte Terry and Ex parte D.J. is not applicable in the dispositional phase of a dependency proceeding under § 12-15-71(a). W.T., supra. The appropriate standard to be applied in the dispositional phase of a dependency proceeding is the “best interests of the child” standard. Id., See also Jones, supra, and D.K.G v. J.H., 627 So.2d 937 (Ala.Civ.App. 1993). Further, there is no requirement that the court find a parent unfit when dependency is found and custody is placed with a relative to protect the welfare of the child. W.T., supra.
Because the court treated this case as an ordinary custody dispute between a parent and nonparent, rather than as a dependency proceeding, it failed to make a finding of dependency regarding the child. In the interest of judicial economy and because the record supports a finding of dependency, we will not remand this case to the trial court for a dependency hearing. Suffice it to say that the grandparents’ petition alleged that the child was dependent, pursuant to § 12-15-l(10)c. That section defines the term “dependent child” as including a child “[wjhose custody is the subject of controversy.” Clearly, the child’s custody is the subject of a controversy in this case. The child had had no contact with the father, other than telephone contact on several occasions, from January 1991 until October 1997. The mother abandoned the child to the custody of his grandparents in January 1992 and consented to their adopting the child. The mother was subsequently murdered. The grandparents adopted the child; the court set aside the adoption, on the father’s motion. Thereafter, the grandparents petitioned the court for custody of the child. We note that the mother and father were never divorced; therefore, there has not been a previous adjudication of custody. Accordingly, we conclude that the evidence supports a finding of dependency in this case, based on § 12-15-l(10)e.
Because this is a dependency case, we need not determine whether the evidence was sufficient to overcome the Terry presumption. W.T., supra. The only determination to be made is whether awarding custody of the child to the grandmother was in the best interests of the child. Id. After carefully reviewing the record, we conclude that it is in the child’s best interests for the grandmother to be awarded custody. The child has lived with *303 the grandmother since he was an infant. The evidence suggests that the child and the grandmother have an excellent relationship and that the grandmother has met all of the child’s emotional, material, educational, health, and religious needs. On the other hand, the father has had virtually no contact with the child and has provided little support for the child. Although the court required the grandmother to satisfy a more stringent burden, it did not err in awarding the grandmother custody of the child. Therefore, we affirm the court’s award of custody to the grandmother.
The father next argues that the court erred in failing to comply with Rule 32(E), Ala. R. Jud. Admin. The grandmother contends that she is the child’s grandmother, rather than the parent, and, therefore, that her income should not be used to establish support under the child-support guidelines set forth in Rule 32. We note that it was the grandmother who amended her petition to seek child support pursuant to Rule 32. In Pruitt v. Pruitt, 669 So.2d 931 (Ala.Civ.App. 1995), this court held that the Rule 32 guidelines applied in a divorce proceeding between two grandparents to require a grandfather to pay child support for his grandchildren whom he had adopted. We noted in Pruitt:
“Regardless of the adoption, our Supreme Court has indicated that a custodial grandparent who invokes the jurisdiction of the court for a determination regarding the matters of custody and support of children may be ordered to do that which he would not be otherwise legally bound [to do]. See Ex parte Lipscomb, 660 So.2d 986 (Ala. 1994).”
669 So.2d at 932, n. 1. Rule 32(A) provides, in part, that “[guidelines for child support are hereby established for use in any action to establish or modify child support, whether temporary or permanent.” Pursuant to Rule 32(E), the filing of a standardized “Child Support Guidelines” form and “Child Support Obligation Income Statement/Affidavit” form is mandatory in each action to establish or modify child-support obligations. Martin v. Martin, 637 So.2d 901 (Ala.Civ.App. 1994). We conclude that the Rule 32 child-support guidelines apply to this case and to the grandmother. The record contains no standardized Child Support Guidelines form and no Child Support Obligation Income Statement/Affidavit form, as required by Rule 32(E). When Rule 32(E) has not been complied with and child support is made an issue on appeal, this court may either remand the case temporarily to the trial court for that court to comply with Rule 32(E) or it may reverse the judgment and remand the case for further proceedings. Id. We remand this case to the trial court so that it may, within 28 days of the date of this order, comply with Rule 32(E).
REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and MONROE, J., concur.
THOMPSON, J., concurs in the result.
CRAWLEY, J., dissents.

. The child’s mother was murdered on May 5, 1995.

. J.L.C., the child’s grandfather, died before the hearing on the grandparents' petition was held.